# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| PAVANDEEP TOOR, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 09-2021 (ESH) |
| ERIC H. HOLDER, JR., Attorney General, | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Plaintiff Pavandeep Toor, a Canadian citizen serving a 35-month federal prison sentence at Moshannon Valley Correctional Institution in Philipsburg, Pennsylvania, claims that the United States Department of Justice ("DOJ") prevented him from applying for transfer to a Canadian prison as he had sought to do pursuant to international treaties and the Transfer of Offenders To or From Foreign Countries Act, 18 U.S.C. §§ 4100-4115. He has sued defendant, alleging that its process for reviewing his transfer application violated international treaties, the Supremacy Clause of the United States Constitution,[1] and the notice-and-comment provisions of Administrative Procedure Act ("APA"), 5 U.S.C. §§ 561-570. Defendant now moves to dismiss Toor's claims for lack of subject matter jurisdiction and for failure to state a claim. For the reasons stated herein, the Court will grant this motion.

---

[1] In his Opposition, plaintiff indicates that he does not oppose the dismissal of his claim based on the Supremacy Clause. (Opp'n at 23 n.26.)

1

## BACKGROUND

On August 27, 2009, after pleading guilty in the Eastern District of California to drug trafficking charges, plaintiff was sentenced to serve 35 months in federal prison. (Def.'s Mot. to Dismiss ("Def.'s Mot."), Ex. C at 2-3 (Public Information Inmate Data).) On October 20, the Federal Bureau of Prisons ("BOP") took custody of Toor – who, until then, had been in the custody of the United States Marshals Service – and moved him to Moshannon Valley Correctional Institution ("Moshannon Valley") in Philipsburg, Pennsylvania. (*Id.* at 1.)

Eight days later, on October 28, 2009, Toor filed suit in this Court, alleging that defendant "prevented Toor from applying . . . in a timely fashion" to be transferred to a Canadian prison for the remainder of his sentence. (Compl. at 1 ¶ 1.) Plaintiff alleges that DOJ's transfer application procedure conflicts with international treaties to which the United States is signatory and with the APA. (*Id.* at 6-7 ¶¶ 12-14, 18-20.) He requests an injunction requiring DOJ to review his transfer application and to align the regulations governing international prisoner transfers with the relevant treaties and with the APA. (*Id.* at 7 ¶¶ 1-2.)

After filing his complaint, Toor met with BOP-provided case workers to express his interest in transfer to Canada; thereafter, he submitted his transfer application to the warden at Moshannon Valley. (Decl. of Sandra Kaz ¶ 6.) The application was received by BOP's Central Office on December 10, 2009, forwarded to DOJ's International Prisoner Transfer Unit ("IPTU") the same day, and denied on January 12, 2010. (*Id.*; Decl. of Paula Wolff ¶ 6.) IPTU then notified its Canadian counterpart in Ottawa, the Canadian Embassy in Washington, and plaintiff's counsel of its decision. (Def.'s Mot., Ex. D at 1.)

Defendant subsequently moved to dismiss, arguing that this Court lacks jurisdiction to hear the case, that the transfer application process does not violate international treaties or the APA, and that the complaint does not state a claim upon which relief can be granted. (Def.'s Mot. at 1-2.)

## ANALYSIS

**I. MOOTNESS**

Defendant argues that this matter is moot, and that the Court therefore does not have jurisdiction to decide the case. The Court agrees.

"Federal courts lack jurisdiction to decide moot cases because their constitutional authority extends only to actual cases or controversies." *Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 70 (1983). The case or controversy requirement "means that, throughout the litigation, the plaintiff must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (internal quotation marks omitted). "Even where litigation poses a live controversy when filed, the [mootness] doctrine requires a federal court to refrain from deciding it if events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *Clarke v. United States*, 915 F.2d 699, 701 (D.C. Cir. 1990) (*en banc*) (internal quotation marks omitted). An intervening event may render a claim moot if there is no reasonable expectation that the conduct will recur. *Pharmachemie B.V. v. Barr Labs., Inc.*, 276 F.3d 627, 631 (D.C. Cir. 2002). "Simply stated, a case is moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Larsen v. U.S. Navy*, 525 F.3d 1, 3 (D.C. Cir. 2008).

Plaintiff seeks to have defendant "accept and process" his application for transfer to Canada. (Compl. at 7 ¶ 1.) When plaintiff commenced this action, he had not yet been able to submit his transfer application. By the time defendant filed its motion to dismiss, IPTU had processed the application, denied it, explained the decision, and notified plaintiff's counsel. No live controversy remains, because plaintiff can no longer claim the harm of an unresolved transfer request. Therefore, a decision in this case could not affect the parties' rights, and the controversy is moot.[2]

Plaintiff argues that the case fits into two exceptions to the mootness doctrine: "capable of repetition, yet evading review" and "voluntary cessation." Broadly, these exceptions provide that "if a plaintiff's specific claim has been mooted, [plaintiff] may nevertheless seek declaratory relief forbidding an agency from imposing a disputed policy in the future." *Nat'l Air Traffic Controllers Ass'n v. Fed'l Serv. Impasses Panel*, No. 08-5479, 2010 WL 2160832, at *6 (D.C. Cir. June 1, 2010) (quoting *City of Houston v. Dep't of Housing & Urban Dev.*, 24 F.3d 1421,

---

[2] Courts often find mootness on similar grounds when an agency action is first challenged as "unlawfully withheld or unreasonably delayed" under the APA, *see* 5 U.S.C. 706(1), and is then rendered during litigation. *See, e.g.*, *Sze v. INS*, 153 F.3d 1005 (9th Cir. 1998) (finding mootness when INS issued decision on plaintiff's naturalization application, despite agency's delay until after statutory deadline and after complaint); *Agbor v. Napolitano*, No. 08-CV-7801, 2009 WL 2432630, at *2 (S.D.N.Y. Aug. 7, 2009) ("Courts have generally held that where, as here, a plaintiff seeks to compel the immigration authorities to adjudicate an application for immigration benefits, and the application is thereafter adjudicated, the case is moot and must therefore be dismissed for lack of subject matter jurisdiction."). In these cases, the delay triggers a well-defined, legally cognizable interest in litigation – for example, an express right of action for the agency's failure to meet its 120-day statutory deadline, *see Sze*, 153 F.3d at 1010 – whereas in the present case, it is unclear that there is any injurious delay in the review of plaintiff's application, given the law's permissive "as soon as practicable" language. *See infra* Part II.C. Regardless, even where there is an express private right of action, if it is undisputed that agency action was unlawfully withheld or unreasonably delayed, then once the agency takes action, no live controversy remains as to its delay.

1429 (D.C. Cir. 1994). The exceptions do not apply here because defendant has shown that there is no threat of reinstating the same action against plaintiff in the future.

### A. Capable of Repetition, Yet Evading Review

Plaintiff's argument that defendant's conduct is "capable of repetition, yet evading review," *S. Pac. Terminal Co. v. ICC*, 219 U.S. 498, 515 (1911), relies upon the D.C. Circuit's decision in *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316 (D.C. Cir. 2009). However, *Del Monte* is distinguishable, and its concerns are not applicable here.

To show that a defendant's conduct is capable of repetition yet would evade review, a plaintiff must demonstrate both that "(1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party would be subjected to the same action again." *Del Monte*, 570 F.3d at 322 (quoting *Clarke*, 915 F.2d at 704) (alteration in original); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983). In *Del Monte*, a produce distributor sued the Office of Foreign Assets Control (OFAC) for failing to issue an export license within a nine-day window as required by regulation. *Id.* at 320. OFAC issued the license after litigation began and argued that the suit was moot. *Id.* at 320-21. Applying the two-pronged test, the Court of Appeals reversed the district court's finding that the case was moot. *Id.* First, the Court of Appeals found that the requested license would expire before the matter could be fully litigated, and second, it found that Del Monte's frequent applications to OFAC for similar export licenses put the parties in a position to repeat the controversy in the future. *Id.* at 321-24. Therefore, the court had jurisdiction over Del Monte's request for declaratory relief. *Id.* at 326.

5

Here, by contrast, plaintiff fails to satisfy the second requirement for the "capable of repetition, yet evading review" exception, because he has not shown any reason to anticipate the parties will face a similar situation in the future. In fact, plaintiff concedes that "he is quite unlikely ever to be charged again with a criminal offense" (Opp'n at 16), and unless he is charged in the United States, he could never be subjected to the challenged action again. There is thus no "reasonable expectation" of repetition, so the exception cannot apply.

> **B.** **Voluntary Cessation**

Another exception to the mootness doctrine urges that a defendant's "voluntary cessation" of a challenged practice does not moot the case, because such a result would leave the defendant free to "'return to its old ways.'" *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000) (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 n.10 (1982)). However, if the allegedly wrongful behavior could not reasonably be expected to recur, then this exception does not apply, and a case may become moot after all. *Id.* The voluntary cessation exception is typically invoked when there is a threat that the defendant will reestablish the challenged and ceased practice *against the plaintiff* after dismissal of the suit. *See, e.g.*, *id.* at 193 (finding that ceasing illegal pollution failed to moot the controversy unless defendant could show that it "could not reasonably be expected" to resume unlawful practices); *Isenbarger v. Farmer*, 463 F. Supp. 2d 13, 23 (D.D.C. 2006) (finding that the Army could issue a new extension of an officer's active duty obligation, after it dropped the challenged extension to try to moot the case).

Although the defendant did voluntarily cease the conduct at issue, there is no real threat of reversion. The challenged conduct was defendant's delay in considering plaintiff's

6

application, but defendant ended that delay by considering and deciding not to grant plaintiff's request. This cessation cannot be reversed while plaintiff serves his current sentence. Defendant has demonstrated the improbability of this inmate making a future transfer request, because this situation can only present itself again if plaintiff is charged, convicted, and incarcerated in the United States for another crime and then applies for transfer. (Reply at 7.) Even plaintiff concedes that such a situation is "quite unlikely." (Opp'n at 16.) The challenged behavior and the means of cessation – *i.e.*, a final decision adverse to plaintiff – remove any threat that defendant will "return to its old ways." *Friends of the Earth*, 528 U.S. at 189. Therefore, the controversy is moot and this Court lacks jurisdiction to hear it.

## II. ALLEGED TREATY VIOLATIONS

In the alternative, defendant argues that there is no private right of action under the Convention, and that even if there were, defendant did not violate the treaties in question.[3] Plaintiff alleges that defendant violated international treaties by delaying the process for reviewing his transfer request. Because the relevant treaties and implementing statute do not create a private right of action, plaintiff has failed to state a valid claim, and even assuming there were such a private right of action, defendant's actions were entirely consistent with its obligations under international treaties.

---

[3] Defendant argues that because the treaties create no private right of action, plaintiff lacks "standing" and the action must be dismissed for lack of jurisdiction. (*See* Mem. of P. &. A. in Supp. of Def.'s Mot. at 12.) However, the absence of a private right of action merely requires dismissal for failure to state a claim under Rule 12(b)(6). *See, e.g.*, *Mora v. New York*, 524 F.3d 183, 189 (2d Cir. 2008) (affirming dismissal of treaty-based claim for failure to state claim upon which relief could be granted, because treaty did not create private right of action); *Cornejo v. County of San Diego*, 504 F.3d 853 (9th Cir. 2007) (same).

A.  **Relevant Law**

The United States and Canada are parties to the Council of Europe Convention on the Transfer of Sentenced Persons, March 21, 1983, T.I.A.S. No. 10,824, 22 I.L.M. 530 (hereinafter "Convention"), which provides broad authorization for prisoner transfers among signatories.[4] Under the Convention a prisoner, the sentencing state, or the receiving state may request a transfer. *Id.* at Art. 2, cls. 2-3. Notably, the Convention never *requires* a state to transfer a prisoner, and in fact, the agreement only allows transfer when all three parties (the prisoner and both states) agree to it. *Id.* at Art. 3, cls. 1(d) & (f). Accordingly, the statute providing for international prisoner transfers pursuant to the Convention vests in the Attorney General the discretion to accept or deny transfer requests, to promulgate regulations implementing relevant treaties and statute, and to delegate implementation within DOJ. *See* 18 U.S.C. § 4102.

B.  **The Convention Does Not Create a Private Right of Action**

In *Medellin v. Texas*, 552 U.S. 491 (2008), the Supreme Court endorsed "the background presumption . . . that '[i]nternational agreements, even those directly benefiting private persons, generally do not create private rights or provide for a private cause of action in domestic courts.'" *Id.* at 506 n.3 (quoting 2 Restatement (Third) of Foreign Relations Law of the United States § 907, Comment *a* (1986)). In dicta, the Court noted approvingly that many circuits, including the D.C. Circuit, require "express language to the contrary" in order to rebut that

---

[4] Both countries also previously ratified the Treaty between the United States of America and Canada on the Execution of Penal Sentences, March 2, 1977, 30 U.S.T. 6263, which also provided for prisoner transfers. While the complaint also references this 1977 bilateral treaty (Compl. at 3 ¶ 7), the parties' arguments rely exclusively on the multilateral Convention, and the substantive similarity of the two treaties makes it unnecessary to analyze both. Moreover, this Court has already held that the 1977 treaty does not provide a private right of action. *See Coleman v. Reno*, 91 F. Supp. 2d 130, 131-32 (D.D.C. 2000). Accordingly, the Court's analysis is focused on the Convention.

presumption and find a privately enforceable right under a treaty. *Id.* (citing *Canadian Transp. Co. v. United States*, 663 F.2d 1081, 1092 (D.C. Cir. 1980)).[5] Moreover, the statute that implements the provisions of the Convention – the Transfer of Offenders To or From Foreign Countries Act, 18 U.S.C. §§ 4100-4115 – does not create a private right of action. *Bagguley v. Bush*, 953 F.2d 660, 662 (D.C. Cir. 1991); *Coleman*, 91 F. Supp. 2d at 132 (discussing *Bagguley*).

Since the Convention has no express language to rebut a presumption against a private right of action, plaintiff lacks standing to sue under the treaty or its implementing statute, 18 U.S.C. § 4102.

## C. Defendant's Actions Conform to Its Obligations under the Convention

At the time of the complaint, plaintiff had not yet applied for transfer to his native Canada. This, he insists, was not for lack of effort on his part, but a result of delays built into defendant's application procedure. Plaintiff asserts that these alleged delays violate the

---

[5] Plaintiff disputes the applicability of *Medellin*, arguing that it was decided on other grounds. Instead, plaintiff urges this Court to view the earlier case of *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006), as controlling. Plaintiff's reliance on *Hamdan* is misplaced. There, the Supreme Court held that a military commission lacked power to try a suspected terrorist "because its structure and procedures violate both the UCMJ [*i.e.*, Uniform Code of Military Justice] and the Geneva Conventions." *Id.* at 567. With respect to the petitioner's rights under the relevant treaty provision, the Court merely concluded that even if the Geneva Convention, on its own, did not "furnish[] petitioner with any enforceable right," it was nonetheless part of the common law of war, which Congress had incorporated into federal statutes via the UCMJ as a limitation upon military commissions' jurisdiction. *See id.* at 627-28; *see also id.* at 602. Thus, *Hamdan* is inapposite and does not contradict *Medellin*'s more recent and more broadly stated presumption against private enforceability of treaty rights both as a general matter, *see, e.g.*, *Mora*, 524, F.3d at 201, and, even more persuasively for the instant case, specifically with respect to international prisoner transfer treaties. *See Yosef v. Killian*, 646 F. Supp. 2d 499, 506-07 (S.D.N.Y. 2009).

9

Convention by not allowing prisoners to begin the transfer application process immediately upon final judgment.

When one signatory to the Convention sentences a citizen of another signatory, and the prisoner has requested transfer, the sentencing state "shall so inform the administering State as soon as practicable after the judgment becomes final." Convention, Art. 4, cl. 2. Plaintiff urges the Court to interpret this language as "an expectation" that the transfer process begin on the date of final judgment. (Opp'n at 14.) But a plain reading of the treaty shows the error of that interpretation. The treaty's language concerning the timing of final judgments is limited to two provisions: the instruction quoted above for when the sentencing state should notify the administering (*i.e.*, receiving) state; and a condition that no prisoner may be transferred under the Convention *before* the sentencing country enters final judgment. *Id.* at Art. 3, cl. 1(b). Even if one reads the quoted language on the timing of notification to also control the timing of the application process itself, the suggested timing is only "*as soon as practicable* after the judgment becomes final," *id.* at Art. 4, cl. 2 (emphasis added), rather than the narrow requirement, as plaintiff urges, "that this is the date on which the process begins." (*See* Opp'n at 14.)

To be sure, defendant's process does not begin as soon as judgment becomes final, but it does begin as soon as practicable after the judgment becomes final. The delay in beginning plaintiff's application process was the time between his sentencing and his relocation into BOP custody and Moshannon Valley. A prisoner requesting transfer must submit his application to the warden at his BOP correctional institution, so until BOP assigns him to an institution and he arrives there, he cannot file his transfer request. *See* 28 C.F.R. § 527.44.

Plaintiff was sentenced on August 27, 2009, and he arrived at Moshannon Valley on October 20. On November 12, plaintiff met with Moshannon Valley case workers to begin his application process. Thus, two months and sixteen days out of plaintiff's 35-month sentence passed before his application process began. The minimal delay before BOP takes custody of a prisoner and before he arrives at his prison fits comfortably within the "as soon as practicable" language set forth in the treaty. Even assuming that plaintiff did attempt to apply for transfer before his move to Moshannon Valley and that defendant prevented him from applying, the alleged prevention does not violate the treaty.

### D. The Decision on Transfer Is Not Judicially Reviewable

When a treaty and statute set out no "particularized standards or criteria" on which to judge a transfer request, the agency reviewing the application has " completely unfettered"discretion. *Bagguley*, 953 F.2d at 662 (interpreting DOJ's discretion under international prisoner transfer treaties and 18 U.S.C. § 4102) (quoting *Olim v. Wakinekona*, 431 U.S. 238, 249 (1983)). Because the United States' prisoner transfer agreements and 18 U.S.C. § 4102 "provide[] no criteria to govern the sentencing state's decision as to whether to agree to the transfer," there is no protected liberty interest in international transfer even when treaties and statute authorize it. *Id.*; *see also Olim*, 461 U.S. at 249-50 (interpreting Hawaiian interstate prison transfer regulations as "plac[ing] no substantive limitations on official discretion and thus creat[ing] no liberty interest"). As such, action on prisoners' transfer requests "is committed to agency discretion by law," thus rendering such decisions unreviewable under the APA. *Bagguley*, 953 F.2d at 662 (quoting 5 U.S.C. § 701(a)(2)).

To the extent that plaintiff bases his grievances on IPTU's decision to reject his transfer application upon review, his claims are not justiciable. In response to this, plaintiff asserts that his claims address "the right to *apply* to transfer rather than the decision of the Attorney General on his application." (Opp'n at 9 n.16.) Yet, many of his arguments address the decision rather than the right to apply.[6] Those arguments fail because they effectively amount to a challenge to agency action that is unreviewable.

## III. ALLEGED VIOLATION OF THE APA

Plaintiff argues that by issuing transfer policies without notice and comment, as required for agency rules, *see* 5 U.S.C. § 553, defendant has violated the APA. Defendant responds that the interpretive regulation in question is neither subject to notice-and-comment requirements nor in conflict with the relevant treaties, statutes, and rules. To the extent that plaintiff's cause of action under the APA is not moot (*see supra* Part II), the Court concludes that it still fails because both DOJ's transfer review policies and its actions in this case comply with APA procedures.

To effectuate this country's international prisoner transfer agreements, Congress delegates transfer decisions and procedures to the Attorney General. *See* 18 U.S.C. §§ 4102. In turn, the Attorney General can delegate those powers within DOJ, *see id.* §§ 4102(11), which he has done by appointing BOP and IPTU to control the transfer process.

---

[6] For example, in his Opposition plaintiff focuses on the economic benefits of approving transfer applications, allegedly improper motives behind defendant's decision to deny his application, the apparent hastiness of the review, prosecutors' dissension from the decision, and allegations of retaliation. (Opp'n at 2-4.) However, plaintiff's complaint does not address the actual decision to deny transfer and offers no factual basis for any inference that defendant denied his request in retaliation for his exercise of his rights.

For its part, BOP has memorialized the transfer application procedure using two regulatory instruments available to agencies under the APA: notice-and-comment rulemaking and interpretive rules. *See* 5 U.S.C. §§ 553(b). The APA provides for the promulgation of substantive rules, *see id.*, and BOP took advantage of this by issuing 28 C.F.R §§ 527.41-527.44 (which address the transfer of Bureau of Prisons inmates to other countries) after publishing it in the *Federal Register* and accepting public comment. *See* Control, Custody, Care, Treatment and Instruction of Inmates, 46 Fed. Reg. 31,210 (June 12, 1981) (proposed rulemaking and request for comments); 46 Fed. Reg. 59,506 (Dec. 4, 1981) (final rules). In this rule, BOP sets out, *inter alia*, the process for submitting and reviewing transfer applications. *See generally* 28 C.F.R. §§ 527.42-527.44. The same rule requires BOP to inform eligible prisoners about the transfer process during prison orientation, *id.* §§ 527.43(a), and requires prisoners to submit their applications to prison wardens. *Id.* § 527.44(a).

To provide for more detailed internal procedures, BOP also issued a program statement on international prisoner transfers. *See* Bureau of Prisons, Program Statement 5140.39 (renumbered from Program Statement 5140.34, Dec. 4, 2009), Transfer of Offenders to or from Foreign Countries (2009) (hereinafter "PS 5140.39"). The APA specifically excludes such "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice" from the notice-and-comment process. 5 U.S.C. § 553(b)(A); *see Reno v. Koray*, 515 U.S. 50, 60-61 (1995) (finding that BOP program statement was exempt from notice-and-comment requirement because it was an "internal agency guideline, which is akin to an 'interpretive rule'"). The program statement clarifies, for example, how to send a prisoner's personal property to the receiving country during a transfer, *see* PS 5140.39 at 10, and the form

13

for eligible prisoners to acknowledge that BOP has made them aware of the possibility of transfer.  *Id.* at 6.  It also reiterates the requirement that a transfer applicant submit his request to a warden, *id.* at 7, and adds details such as the forms that make up a complete application and to whom the warden must forward it.  *Id.* at 7-9.

Plaintiff argues that the program statement violates the APA because it did not go through the notice and comment process.  In particular, he alleges that BOP's procedure of requesting transfer through prison wardens and after prison orientation, which delayed his opportunity to apply for transfer, is invalid for having been promulgated without notice and comment.  But the operative provisions and transfer application requirements are embodied in a rule promulgated after notice and comment, in the form of 28 C.F.R. § 527.44.  Therefore, BOP published in the *Federal Register* the requirements that ultimately delayed plaintiff's application until his move to Moshannon Valley; the public had an opportunity to comment on them; and the rule was announced as final in the *Federal Register*, all before the rule's official promulgation. The program statement added only internal BOP guidelines, so it was not subject to the notice-and-comment requirements of the APA.

## CONCLUSION

For the reasons discussed above, this Court will grant defendant's motion to dismiss for lack of jurisdiction or, in the alternative, for failure to state a claim on which relief can be granted.  A separate Order accompanies this Memorandum Opinion.

/s/  
ELLEN SEGAL HUVELLE  
United States District Judge

Dated:   June 15, 2010